# DEPARTMENT OF EDUCATION and RALPH D. TURLINGTON v. McGHEE

## Case No. 83-3412

State of Florida, Division of Administrative Hearings

January 7, 1985

## APPEARANCES OF COUNSEL

**J. David Holder** for Petitioner.

**Ronald G. Myer** for Respondent.

## OPINION

### RECOMMENDED ORDER

J. LAWRENCE JOHNSTON, Hearing Officer.

The first part of the final hearing in this case was held in Daytona Beach on September 13-14, 1984. The final hearing was resumed and completed in Tallahassee on November 14, 1984.

The issue is whether the Education Practices Commission should discipline respondent Elizabeth Gallon McGhee (McGhee) on charges of misconduct. Specifically, petitioner alleges that, while Assistant

Principal at Seabreeze Senior High School during the 1982-1983 school year, McGhee:

1. Falsified student enrollment records to include a student who had in fact graduated at the end of the first semester and, upon questioning, falsely indicated to staff members that the student was enrolled as a full-time student when in fact she had previously graduated; and

2. Falsified another student's grades by recording grades which had not been assigned by the student's teachers nor earned by the student.

### FINDINGS OF FACT[1]

1. Respondent Elizabeth Gallon McGhee (McGhee) holds Florida teaching certificate 231757 issued by the Florida Department of Education covering the areas of business education, vocational education, junior college, coordinator of DCT, vocational education director and teacher cooperative distributive education.

2. McGhee was employed as an assistant principal for data processing at Seabreeze Senior High School for eight years. Her last year at Seabreeze Senior High School (Seabreeze) was the 1982-1983 school year.

3. During the 1982-1983 school year, Mrs. Gwendolyn Biddle served as Principal of Seabreeze, Mr. Joseph Nelson served as Associate Principal, Mr. Robert Wheeler served as Assistant Principal in charge of student control and McGhee served as Assistant Principal for data processing.

4. As assistant principal in charge of data processing, McGhee's essential job was to control the type of information relating to student attendance, student schedules and student grades fed into the Volusia County School District computer in Deland to assure that the information came from a proper source and was accurate. She was also responsible for seeing that the information was timely and accurately fed into the computer and was responsible for distributing computer-generated reports to the proper people.

Until approximately the end of 1982, McGhee and her staff "bubbled" (i.e., darkened the appropriate spaces on) computer paper and

---

[1] Both parties submitted proposed findings of fact. The proposed findings of fact were reviewed, and the following Findings Of Fact attempt to rule, either directly or indirectly on each proposed finding of fact. Proposed findings of fact which were approved and adopted in the following Findings of Fact. Where proposed findings of fact are not reflected and no direct ruling rejecting them is apparent, the proposed findings of fact have been rejected as being subordinate, cumulative, immaterial or unnecessary.

sent the bubbled computer paper containing the information to be fed into the computer from Seabreeze, near Daytona Beach, to Deland, where the computer is located. Other school board personnel would then feed the bubbled computer paper into the computer, and the computer would read, process and store the information. Near the end of 1982, a computer terminal was installed in the office area of Registrar Barbara Ivey and McGhee at Seabreeze. After appropriate training, Biddle, McGhee, Records Clerk Dolly Lockwood and Registrar Barbara Ivey were able to directly input information into the computer in Deland. However, neither Biddlr nor Lockwood ever used the computer terminal for this purpose. Most of the actual use of the computer terminal was by Seabreeze's registrar, Barbara Ivey.

5. McGhee also was responsible for preparation of Seabreeze's FTE reports for purposes of establishing its proper state funding level. McGhee would prepare this report by reference to computer-generated information maintained at her office regarding the student population and perhaps other information. In addition, on the day prescribed by FTE reporting procedures, McGhee would have to ascertain whether any students were absent on that day and five consecutive previous days and, if there were any, delete those students from the reported student population. The only exception is that seniors who graduate at the end of the first semester of school are counted for FTE purposes in the second semester even though they are not enrolled and do not attend in the second semester.[2] Such information was not maintained by McGhee, and she would inquire of other Seabreeze administrators, namely Nelson, Wheeler and Marilyn Sweet, Wheeler's Administrative Assistant. Those individuals, not McGhee, were involved in preparation and maintenance of excused absence lists, unexcused absence lists, 20-day attendance reports and excessive absences.

6. Normally, teachers would report absences to Sweet. If excuses were communicated to Sweet's office, the absentee student would be placed on a list of excused absences which Sweet would circulate directly to the teachers. The names of any students whose absences were not excused were typed on an "unexcused absence" list. Before unexcused absentee students could return to class, they would have to present an authorization slip to the teacher. Sweet accumulated the unexcused absence and excused absence lists and sent them to Nelson every week or so.

7. Nelson normally was responsible for bubbling the excused and

---

[2] Respondent's Exhibit 2, the FTE Manual, is received in evidence over petitioner's objection.

unexcused absence information onto computer paper. Nelson sent the bubbled computer paper to Deland, and the computer would generate a 20-day attendance report showing excused and unexcused absences for consecutive 20-day periods of the school year.

8. From November 1982 through the beginning of March 1983, Nelson was absent due to heart surgery and recuperation. In Nelson's absence, Sweet or Wheeler would deliver the excused and unexcused absence lists to either Ivey or McGhee to be bubbled onto computer paper and sent to Deland.

9. Regarding enrollment and withdrawal from school, enrollment was initiated and maintained by the preparation of a student schedule. The student schedule was prepared in Seabreeze's guidance counseling office and sent to McGhee's office for input into the computer in Deland. The computer generated six copies of the schedule of each of the 1200-1300 Seabreeze students. McGhee, the student, the guidance department, the student referral department, Nelson and Ivey each got a copy of each student's schedule. Students' schedules could only be changed upon a request initiated by a teacher on a form provided for that purpose and approved by McGhee. Withdrawal of a student from enrollment normally was initiated by Nelson based upon information he solicited from teachers as to whether any students in their classes were not appearing for class over an extended period of time. In Nelson's absence, no administrator was assigned to assume this duty, and no administrator did.

A. Student X[3]

10. Student X was in her 12th grade year during the 1982-1983 school year. Because she had sufficient credits (15) to meet graduation requirements at the end of the first semester and because she had informed school officials of her intention to enroll at Daytona Beach Community College (DBCC) when its second semester commenced on January 6, 1983, Student X was permitted to leave Seabreeze as a non-returning senior as of December 17, 1982. A December 6, 1982 memorandum from the guidance department was distributed to all faculty members listing Student X as one of 19 students who were completing their course work on December 17, 1982. The memoran-

---

[3] By Final Order, entered by the Circuit Court, Seventh Judicial Circuit in and for Volusia County, Florida, in Case No. 84-1086-CA-01, Division L, on May 15, 1984, it was ordered that the two students whose records are alleged in this case to have been falsified be identified by pseudonyms. In compliance with this order, the parties agreed to refer to the student whose attendance records are alleged to have been falsified as Student X and to refer to the student whose grades have been alleged to have been falsified as Student Y.

dum also listed the names of other students who remained at Seabreeze until the end of the first semester on January 20, 1983 but would not be returning for the second semester due to early graduation.

11. After distribution of the memorandum referred to in the immediately preceding paragraph, Student X discovered that she would not be entitled to social security benefits on which she had relied to fund her attendance at DBCC, and she decided to finish the first semester and re-enroll for the second semester. Student X took steps to have a student schedule for her prepared for the second semester.

12. Towards the very end of the first semester, Carol Boatner, an occupation specialist at Seabreeze, received an inquiry from the City of Daytona Beach Jobs For Youth Program whether several students, including Student X, would be eligible to continue in the program during the second semester. Referring to the memorandum on early graduation, Boatner promptly replied that Student X would not be a student at Seabreeze during the second semester, making her ineligible. When the City of Daytona Beach notified Student X of her ineligibility, Student X went to Boatner's office and insisted that she was eligible and that Boatner could check with McGhee as to her eligibility. Boatner telephoned McGhee, who accurately replied that Student X was enrolled as a student at Seabreeze for the second semester.

13. Although enrolled at Seabreeze for the second semester, Student X never appeared for class. The teachers whose schedules included Student X were confused because of the early graduation memorandum indicating that Student X would not be enrolled during the second semester. Because of the confusion, none of the teachers ever reported to Sweet or Wheeler that Student X was absent, and Student X's name did not appear on any of the excused or unexcused absence lists transmitted from Wheeler and Sweet to McGhee and Ivey. Likewise, Ivey (in Nelson's absence) did not bubble Student X's name onto the computer paper for use in preparing the 20-day attendance reports, and Student X was not reported as absent on any of the 20-day attendance reports.

14. Student X's schedule indicated that she was to be McGhee's student aide during the third class period in the second semester. Like Student X's other teachers, McGhee did not turn her in absent; unlike Student X's other teachers, McGhee did know that Student X was supposed to be enrolled and attending during the second semester. However, all student aides at Seabreeze reported to Mr. Nelson on the first day of each semester. Normally, Mr. Nelson would have told the students whom they will be assisting and sent the students to their

**173**

various assignments. In Mr. Nelson's absence, however, Biddle had the student aides who were milling around the administration offices awaiting assignments sent to the student service department for their assignments since a vast majority of the student aides are assigned in that area. When Student X did not report to McGhee for the third period, McGhee assumed her schedule had been changed and did not report her absent.[4]

15. The second semester began Monday, January 24, 1983. By February 18, 1983, Student X had resigned her position with the City of Daytona Beach Jobs For Youth Program. Later, in March 1983, a fellow employee at Seabreeze questioned McGhee about Student X's status as a student during the second semester. McGhee answered to the effect that she had learned that Student X had obtained full-time employment, had resigned her position with the City of Daytona Beach Jobs For Youth Program, and was withdrawing from Seabreeze. McGhee said that arrangements were being made to officially disenroll Student X.[5]

16. In fact, McGhee had little further to do with Student X or her enrollment status at Seabreeze. McGhee was not responsible for effecting student withdrawals from school, and she did not withdraw Student X. Finally, on or about May 6, 1983, the administrative process of withdrawing Student X as a student at Seabreeze was completed through normal channels.

B. Student Y[6]

17. Student Y was in her 11th grade during the 1982-1983 school year. McGhee has known Student Y for most of Student Y's life. McGhee lives in the same community and attends the same church as Student Y and her mother. Student Y's mother also worked in the beauty parlor where McGhee has had her hair done for several years.

---

[4] Petitioner introduced evidence to suggest that McGhee knew Student X was supposed to report to her during the third period and purposely did not report her absent as part of a scheme to falsify attendance records regarding Student X so that Student X could keep a part-time job that she had with the City of Daytona Beach Jobs For Youth Program. However, the evidence was not convincing enough to support a finding of fact to that effect.

[5] The Department introduced evidence to suggest that McGhee admitted to a fellow employee that she had intentionally falsified records and disseminated false information on the enrollment status of Student X in order to allow Student X to keep her job with the City of Daytona Beach Jobs For Youth Program. However, given the distinct possibility that McGhee's words could have been misheard or misunderstood, this evidence was not sufficient to support a finding of fact either.

[6] See footnote 3 above.

174

Student Y was McGhee's student aide during the second semester. McGhee had a personal interest in Student Y's welfare and knew that Student Y needed credit for all of her first semester courses in order to meet graduation requirements by the end of the school year.

18. Within two weeks of the start of the 1982-1983 school year at Seabreeze, Student Y stopped attending classes because of personal health reasons. Over a month later, on or about October 20, 1982, Student Y was placed on Seabreeze's homebound program. Under the homebound program, Student Y was assigned a homebound teacher who was responsible for visiting Student Y approximately three times a week, two hours a visit, to teach Student Y's lessons, assign homework, pick up completed homework assignments, grade assignments (or, if the homebound teacher was not proficient in the subject, have other teachers grade the assignments) and give Student Y grades for the courses she took on the homebound program. However, Seabreeze's policy is not clear on whether the homebound teacher is authorized to assign grades for, or change grades previously assigned for, the grading period[7] during which a student begins the homebound program.

19. Among other grades not at issue in this case, Student Y's regular classroom teachers assigned her the following grades upon the conclusion on November 4, 1982 of the first grading period of the first semester of the school year:

| | |
|---|---|
| Textiles and Clothing | I (incomplete) |
| Human Development | F |
| Shorthand I | I |

20. Shortly after the start of the homebound program, it was decided by Student Y's teachers and guidance counselors that Human Development was an inappropriate course to take on the homebound program since it consists primarily of class discussion. It was decided that Student Y should drop Human Development and add Housing and Home Furnishings. On or about December 12, 1982, a drop/add form was processed to McGhee's office to effect the change. However, since no Housing and Home Furnishings course was offered during the first semester, the school district's computer could not accommodate the change and, although Student Y ceased taking the Human Development course and began taking instruction in Housing and Home Furnishings, this course change was never reflected on her official records.

21. Student Y did not receive any assignments in Housing and Home

---

[7] At Seabreeze, each school year has two semesters, and each semester has two grading periods.

Furnishings until December 17, 1982, the day the Christmas holidays began. Classes did not resume until January 3, 1983. Student Y was in the hospital for most of January 1983, and the first semester ended on January 20, 1983. Student Y was dismissed from the homebound program on February 1, 1983.

22. Towards the end of the first semester, Student Y's regular classroom teacher in Shorthand I processed a grade change form to McGhee's office to change Student Y's first grading period I to an F. Upon the conclusion of the first semester, the same teacher included Student Y on her computer paper listing grades for the second grading period of the first semester, bubbled an F as Student Y's grade, and submitted the grades to McGhee's office in the course of Seabreeze's normal procedures. McGhee did not have either F entered into the computer.

23. At the end of the first semester, Student Y's homebound teacher did not know what grades to give Student Y in Housing and Home Furnishings because Student Y had only completed Chapter 1 while on homebound or in Textiles and Clothing because Student Y had completed less than half of her assignments. She also did not know what grade to give Student Y in typing because she was not invovled with Student Y's typing course. Rather than resolve these questions, the homebound teacher simply did not turn in any grades for Student Y upon the conclusion of the first semester.

24. Faced with the lack of any grades from the homebound teacher, McGhee had Student Y assigned an I for Textiles and Clothing for the second grading period, first semester. She also assigned Student Y an I for the second grading period, first semester, in the course that appeared on the computer-generated records as Human Development, not knowing or remembering that Student Y's teachers and guidance counselors had attempted to drop Human Development and add Housing and Home Furnishings. McGhee also ignored the Fs assigned by Student Y's regular classroom teacher in Shorthand I for the first grading period (changed from I) and second grading period, first semester, reasoning that the homebound teacher was responsible for assigning those grades, not the regular classroom teacher. But again faced with the lack of any grades from the homebound teacher, McGhee had Student Y's I for the first grading period left intact and had Student Y assigned an I for the second grading period, first semester, in Shorthand I. Whether through inconsistency or oversight, McGhee accepted a grade of F from Student Y's regular classroom teacher in Food and Nutrition for the second grading period, first

176

semester, although McGhee later believed that a grade of C had been assigned and entered into the computer.

25. As the end of the third grading period of the school year on March 24, 1983 approached, McGhee still had not received grades for Student Y from the homebound teacher and began to search them out. She was not able to reach the homebound teacher by telephone and left messages asking that her calls be returned. On the last possible day for entry into the computer of grades to appear on the students' report cards for the third grading period, McGhee telephoned the homebound teacher's supervisor for assistance. However, the supervisor did not return McGhee's call until too late. McGhee explained to the supervisor that the homebound teacher was extremely tardy in assigning grades for Student Y but did not concern herself with the matter any further. Since the next deadline to enter grades into the computer was not until the end of the final grading period on June 7, 1983, there was no longer an urgency to get the grades from the homebound teacher.

26. A few weeks later, in mid-April, 1983, Student Y's homebound teacher responded and brought McGhee grades for Student Y. (Petitioner's Exhibit 19) The grades included a C in Foods and Nutrition. In Shorthand I, the homebound teacher assigned a C for the first quarter, an F for the second quarter and a semester grade average of D. The homebound teacher had no grade for Typing, but McGhee reported to her that the typing teacher had assigned a B, and the homebound teacher added a B in Typing to the list of grades. In Housing and Home Furnishings and Textiles and Clothing, the homebound teacher did not assign a grade, but rather reported in narrative form that Student Y had not completed the coursework. (The homebound teacher had not even seen or heard from Student Y since February 1, 1983). Although the homebound teacher did not assign a specific grade in those two courses on her list of grades, the narrative supports her testimony that Student Y's work in those courses deserved a grade of F.

27. McGhee took the homebound teacher's list of grades and, on April 27, 1983, entered or had the registrar, Barbara Ivey, enter the following grade changes for Student Y using the computer terminal in Ivey's office area:

Foods and Nutrition, second grading period, grade change from F to C.

Textiles and Clothing, first grading period, grade change from I to C.

Textile and Clothing, second grading period, grade change from I to C.

Human Development, first grading period, grade change from F to C.

Human Development, second grading period, grade change from I to C.

Shorthand I, first grading period, grade change from I to C.

Shorthand I, second grading period,

28. The grade changes McGhee made or caused to be made on April 27, 1983 with respect to Student Y's courses in Textiles and Clothing and Human Development were intentional distortions or misrepresentations of fact, were dishonest, and were done to induce persons reviewing Student Y's records to believe that she had earned passing grades in those courses. In fact, neither Student Y's regular classroom teachers nor her homebound teacher assigned Student Y the C's that were entered into the computer as Student Y's grades in those courses on April 27, 1983.[8]

29. As a result of the grade changes which McGhee made or caused to be made on April 27, 1983, Student Y received one credit towards graduation for courses in which she did not receive or earn passing grades. Nonetheless, Student Y still was one-half credit short of meeting graduation requirements and did not graduate with the other graduates on June 5, 1983. Instead, Student Y graduated on July 14, 1983, after completing a make-up course in Sociology.

30. From the 1977-1978 school year through the 1982-1983 school year at Seabreeze, McGhee received "above average" evaluations from Biddle in all categories, including: "Professional Growth and Ethics 1. Observes Code of Ethics."

---

[8] None of the other grade changes fall into the same category of conduct. Because of the confusion in Seabreeze's policy on assigning grades for students on the homebound program, McGhee may have been justified in accepting the homebound teacher's grades in Shorthand I instead of the grades submitted by the regular classroom teacher. The entry of a D for the second grading period grade instead of the F assigned by the homebound teacher may be explained by McGhee's attempt to give effect to the homebound teacher's intent to assign an overall semester grade of D for Student Y in Shorthand I. If assigning a D for the second grading period was not necessary to give effect to the homebound teacher's intent to assign an overall semester grade of D, no fraudulent or dishonest motive can be attributed to McGhee and the entry of a D in the second grading period probably was a mistake. As for the Food and Nutrition grade, McGhee simply entered, or had entered, the grade that was assigned by the homebound teacher.

## CONCLUSIONS OF LAW

1. The Department seeks to discipline McGhee's teacher certificate under Section 231.28(1), Florida Statutes (1983), which provides in pertinent part:

(1) The Education Practices Commission shall have authority to suspend the teaching certificate of any person as defined in s. 228.041(9) or (10) for a period of time not to exceed 3 years, thereby denying him the right to teach for that period of time, after which the holder may return to teaching as provided in subsection (4); to revoke the teaching certificate of any person, thereby denying him the right to teach for a period of time not to exceed 10 years, with reinstatement subject to the provisions of subsection (4); to revoke permanently the teaching certificate of any person; or to impose any other penalty provided by law, provided it can be shown that such person:

. . . . . . . . . . .

(f) Upon investigation, has been found guilty of personal conduct, which seriously reduces his effectiveness as an employee of the school board;

. . . . . . . . . . .

(h) Has otherwise violated the provisions of law or rules of the State Board of Education, the penalty for which is the revocation of the teaching certificate.

McGhee is included in the definition set forth in Section 228.041(9), Florida Statutes (1983).

2. Section 231.28(1), Florida Statutes (1983), is penal in nature and should be strictly construed. See *School Board of Pinellas County v. Noble*, 384 So.2d 205 (Fla. 1st DCA 1980).

3. The Department did not prove that McGhee's effectiveness as an employee of the Volusia County School Board was seriously reduced as a result of the charges against her. Therefore, no discipline can be imposed under subparagraph (f) of Section 231.28(1).

4. The Department's proposed discipline under subparagraph (h) of Section 231.28(1) is premised upon alleged violations of Section

232.023, Florida Statutes (1983),[9] and Rule 6B-1.06(4)(b) and (5)(a) and (g), Florida Administrative Code.

5. Section 232.023, Florida Statutes (1983), provides:

The presentation of reasonable and satisfactory proof that any teacher, principal or other school personnel or school officer has falsified or caused to be falsified attendance records for which he is responsible shall be sufficient grounds for the revocation of his teaching certificate by the Department of Education or for dismissal or removal from office.

6. The Department did not prove that McGhee falsified or caused to be falsified any attendance records.

7. Rule 6B-1.06, Florida Administrative Code, provides in pertinent part:

(1) The following disciplinary rule shall constitute the Principles of Professional Conduct for the Education Profession in Florida and shall apply to any individual holding a valid Florida teacher's certificate.

(2) Violation of any of these principles shall subject the individual to revocation or suspension of the individual teacher's certificate, or the other penalties as provided by law.

. . . . . . . . . . .

(4) Obligation to the public requires that the individual:

. . . . . . . . . .

(b) Shall not intentionally distort or misrepresent facts concerning an educational matter in direct or indirect public expression.

. . . . . . . . . .

(5) Obligation to the profession of education requires that the individual:

(a) Shall maintain honesty in all professional dealings.

. . . . . . . . . .

(g) Shall not submit fraudulent information on any document in connection with professional activites.

---

[9] The Department never specifically charged McGhee with violating Section 232.023, Florida Statutes (1983), and first proposed to impose discipline for violating that specific statute in its proposed recommended order. However, in alleging a factual basis for its charge that McGhee violated the other statute and rules, the Department gave McGhee specific notice of the *conduct* which it charged and attempted to prove. The issues were tried with the consent of the parties. There is no prejudice to McGhee in treating the Department's proposed recommended order as a motion for leave to amend the charge to conform with the evidence and granting leave to amend.

· · · · · · · · · · ·

8. The Department did not prove that McGhee violated any of the above-quoted provisions of Rule 6B-1.06, Florida Administrative Code, by the evidence relating to Student X. The Department did prove, however, that McGhee violated all the above-quoted provisions of Rule 6B-1.06, Florida Administrative Code, by changing Student Y's grades in Textiles and Clothing and Human Development, and thereby violated Section 231.28(1)(h), Florida Statutes (1983).

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that:

That Education Practices Commission enter a final order:

(1) finding respondent Elizabeth Gallon McGhee guilty of having violated Rule 6B-1.06, Florida Administrative Code, and Section 231.28(l)(h), Florida Statutes (1983), and

(2) suspending her teacher certificate number 231757 for one year.

## EXCEPTIONS TO HEARING OFFICER'S RECOMMENDED ORDER

The Respondent in the above-styled action, Elizabeth Gallon McGhee, tenders these exceptions to the Hearing Officer's Recommended Order pursuant to Rule 6B-12.08, Florida Administrative Code and avers as follows:

1. *Exception One.* The Respondent excepts to the finding set forth in the paragraph of the Recommended Order numbered 27 finding that the Respondent "entered" grades for Student Y on the school's computer terminal. Such finding is not supported by any competent, substantial evidence.

2. *Exception Two.* The Respondent excepts to the finding set forth in the paragraph of the Recommended Order numbered 28 finding that "The grade changes McGhee made or caused to be made on April 27, 1983 with respect to Student Y's courses in Textile and Clothing and Human Development were intentional distortions or misrepresentations of fact, were dishonest, and were done to induce persons reviewing Student Y's records to believe that she had earned passing grades in those courses." Such finding is not supported by competent, substantial evidence.

3. *Exception Three.* The Respondent excepts to the finding set forth

181

in the paragraph of the Recommended Order number 29 finding that McGhee "made" any grade changes involving Student Y. Such finding is not supported by competent, substantial evidence.

4. *Exception Four.* The Respondent excepts to the finding set forth in the paragraph of the Recommended Order numbered 18 and the footnote numbered 8 finding that the policy on assignment of grades to homebound students is not clear. Such finding is not supported by competent, substantial evidence.

5. *Exception Five.* The Respondent excepts to the finding set forth in the paragraphs of the Recommended Order numbered 26 and 28 finding that Petitioner's Exhibit Number 19 was the document containing grades submitted by the Homebound Teacher for Student Y and that the grades entered into the computer by Barbara Ivey on April 27, 1983 did not reflect the grades which were actually turned in by the Homebound Teacher. Such finding is not supported by competent and substantial evidence and the essential requirements of law have not been complied with as a result of Petitioner's Exhibit 19 being received into evidence.

Dated this 28th day of January, 1985.

## FINAL ORDER

Respondent, Elizabeth G. McGhee, holds Florida Teaching certificate number 231757. Petitioner filed an Administrative Complaint seeking suspension, revocation, or other disciplinary action against the certificate.

Respondent requested a formal hearing and one was held before the Division of Administrative Hearings. A Recommended Order has been forwarded to the panel pursuant to Section 120.57(1), F.S.; it is attached to and made a part of this Order.

A panel of the Education Practices Commission met on March 1, 1985, in Tallahassee, Florida, to take final agency action. The Petitioner was represented by J. David Holder, Esquire. The Respondent was represented by Ron Meyer, Esquire. The panel has reviewed the entire record in the case.

The panel adopts the Findings of Fact of the Recommended Order, with the exception of paragraph 18 of the Recommended Order which finds that Seabreeze's policy on homebound teachers to be unclear regarding the assignment or change of grading periods in which a student commences a homebound program. The panel specifically finds this finding is not supported by competent, substantial evidence. (See Respondent's Exceptions to the Recommended Order, Exception

182

Four). The remainder of the Exceptions submitted by Respondent are rejected by the panel.

The panel adopts the Conclusions of Law of the Recommended Order.

The panel rejects the penalty recommended by the hearing officer and more specifically, reduces it based upon the local school system having retained Respondent in its employ and upon the findings in the Recommended Order at page nine, paragraph twenty-four, line six and page ten, paragraph twenty-four, line one.

Therefore, it is hereby ORDERED that Respondent be reprimanded and placed on probation for a period of two (2) years, during which time Respondent's supervisor shall furnish annual evaluations to the Commission for its review.

This Order may be appealed by filing notices of appeal and a filing fee, as set out in Section 120.68(2), F.S., and Florida Rule of Appellate Procedure 9.110(b) and (c), within 30 days of the date of filing.

DONE AND ORDERED this 18th day of April, 1985.